UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

KARI KAUFFMAN,

              Plaintiff,

     v.

COMMISSIONER of Social Security,

              Defendant.

Case No.: 1:12-cv-00772-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

    Plaintiff Kari Kauffman ("Kauffman") filed this action under section 205(g) of the Social Security Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the Commissioner of Social Security (the "Commissioner") who denied her social security disability insurance benefits ("Benefits"). Because the Commissioner's findings are supported by

PAGE 1 – FINDING & RECOMMENDATIONS                           {KAR}

substantial evidence on the record, the Commissioner's decision should be affirmed and this case dismissed.

## Procedural Background

On or about March 26, 2009, Kauffman filed an application for Benefits alleging an onset date of November 5, 2008. The application was denied initially, on reconsideration, and by Administrative Law Judge James Yellowtail ("ALJ") after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

## Factual Background

Kauffman was born in 1964. (Admin. R. 34). She attended community college without receiving a degree or certificate. (Admin. R. 34). Her past relevant work experience includes grocery clerk. (Admin. R. 35). Kauffman has not been involved in a successful work attempt since November 5, 2008. (Admin. R. 35). Kauffman alleges disability because of rheumatoid arthritis and cerebral palsy. (Admin. R. 38, 40). Kaufman last met the insured status requirements entitling her to Benefits on March 31, 2014. (Admin. R. 12).

I.     Claimant/Lay Witness Evidence

At the October 21, 2010 hearing, and in documents filed with the Commissioner, both Kauffman and her father, Merwyn Hulburt ("Hulburt"), testified about Kauffman's conditions, work history, daily activities, and limitations.

### A. Ailments & Limitations

Kauffman has rheumatoid arthritis which causes her joints to ache. (Admin. R. 38). When she stands for two or more hours, her ankles hurt and her feet swell. (Admin. R. 38, 43). When she sits for more than one to two hours, her hips ache. (Admin. R. 43). After long periods of standing or sitting, Kauffman has pain and swelling for the remainder of the day, even if she

takes regular breaks. (Admin. R. 43). Hulburt, who also suffers from rheumatoid arthritis (Admin. R. 54), estimated that Kauffman spends 90 percent of her time lying down in bed. (Admin. R. 52). Kauffman testified that her primary care physician told her that her condition will never improve. (Admin. R. 170). "My feet, hands, hips, and shoulders burned out." (Admin. R. 170).

It is painful for Kauffman to reach her arms in any direction. (Admin. R. 45). Her arms hurt when she bends her knees. (Admin. R. 47). She cannot lift her hands over her head without severe shoulder pain. (Admin. R. 38). She cannot lift more than five pounds. (Admin. R. 44). Kauffman struggles to grip anything with her hands. She needs both hands to carry a gallon of milk, grasp a stapler, or hold a soda can. (Admin. R. 44-45). Her father observed that she can "hardly eat dinner without dropping things." (Admin. R. 51).

Kauffman also suffers from cerebral palsy. (Admin. R. 40). Kauffman was first diagnosed with the condition as a little girl and, at the time of the hearing, she had never received treatment for it. (Admin. R. 40, 46). She testified that it did not interfere with her prior employment as a grocery clerk. (Admin. R. 46). Kauffman's cerebral palsy slows her motor skills and causes her to shake. (Admin. R. 40, 45). Hulburt observed that it is hard for Kauffman to walk. He described her gait as a "shuffle" and estimated that her pace is about half that of an average person. (Admin. R. 51-52). In particular, it is difficult for her to climb stairs. (Admin. R. 51). Hulbert testified that he once saw her fall on courthouse stairs. (Admin. R. 51). Kauffman said that her cerebral palsy also affects her voice. (Admin. R. 41). The Social Security representative, B. Done, who helped Kauffman file her Benefits claim over the phone noted that her speech was slurred and that she was "extremely difficult to understand." (Admin. R. 123).

Both Kauffman and Hulburt testified that Kauffman's overall condition has deteriorated over time. (Admin. R. 40, 50). Hulburt testified that Kauffman always had a slower pace but that recently her condition appeared to be worsening. (Admin. R. 52-53). In particular, Hulburt said he had seen a negative change in his daughter in the eight months preceding the hearing. (Admin. R. 56).

### B. Work History & Daily Activities

Kauffman worked as a full-time grocery clerk at Safeway for twenty-two years until she was terminated for theft on November 5, 2008. (Admin. R. 35). Kauffman surmised that she couldn't have continued working, even if she had not been fired, since she was unable to lift fifty pounds and could not stand without her feet swelling. (Admin. R. 36). Another clerk lifted heavier items for her. (Admin. R. 47). Kaufman testified that, near the end of her employment, she was absent twice a month on average. (Admin. R. 47). During her employment, Safeway never expressed dissatisfaction with Kauffman's physical ability to fulfill her job duties. (Admin. R. 36).

In March 2009, Kauffmann applied for Benefits. (Admin. R. 102). She reported that her disabling condition began on November 5, 2008, the date she was terminated by Safeway. (Admin. R. 109). A month later, in April 2009, Kauffmann submitted a "Function Report" to the Social Security Administration in which she represented that she took care of herself, her daughter, and her cat; prepared meals three to four times a week; cleaned her apartment weekly; drove a car; cross-stitched, scrapbooked, and read twice a week; and could walk a mile without resting. (Admin. R. 139-146). At the hearing, the ALJ inquired into Kauffman's representation that she could walk a mile, to which Kauffman responded that she had never walked a mile, she was merely estimating her abilities, and, if she did walk a mile, she would be very tired.

(Admin. R. 39). Hulburt testified that he did not think Kauffman was capable of walking a mile at the time that she indicated such in her report. (Admin. R. 55).

After her termination, Kauffman searched for job opportunities that would not require her to lift or stand. (Admin. R. 36). In October 2009, Kauffman applied for unemployment benefits which she received for two months. (Admin. R. 37). Kauffman acknowledged that, in order to receive the benefits, she had represented to the government that she was capable of working and willing to do so. (Admin. R. 37-38). However, she qualified to the ALJ that she did not think that her capabilities extended past part-time work. (Admin. R. 38).

At the time of the hearing, Kauffman was living with her father and stepmother in Gold Beach, Oregon. (Admin. R. 33). Kauffman testified that she moved in with her parents in February 2010 because she could no longer afford to pay rent. (Admin. R. 67). She testified that she could still care for herself, the home, her finances, and her schedule. (Admin. R. 41-42). However, her stepmother did most of the household chores. (Admin. R. 47). She said she used to enjoy cross-stitching and scrapbooking, but her primary hobby is now reading. (Admin. R. 42). Hulburt testified that he did not think Kauffman was capable of cross-stitching or scrapbooking any longer. (Admin. R. 55).

## II.  Medical Evidence

In Kauffman's Benefits application, she listed two medical providers who might have medical records regarding her condition: Dr. Sidney Cassell, whom Kauffman last visited in 2005, and Bay Clinic, which Kauffman last visited in 2001. (Admin. R. 128-129). The Administrative Record does not include medical records from Dr. Cassell or the Bay Clinic. Kauffman did not report any planned or upcoming doctor's appointments. (Admin. R. 129).

On May 2, 2009, Dr. Raymond Nolan ("Dr. Nolan") conducted an administrative examination of Kauffman (Admin. R. 212).  Dr. Nolan noted that Dr. George Potter first diagnosed Kauffman with rheumatoid arthritis in 2001.[1]  (Admin. R. 212).  He wrote that Dr. Potter and, subsequently Dr. Cassell both prescribed medication to Kauffman that she felt worsened her joint pain.  (Admin. R. 212).  At the time of Dr. Nolan's examination, Kauffman had ceased all prescriptions and was self-treating with Tylenol.  (Admin. R. 212).

Kauffman's chief complaints to Dr. Nolan were foot pain and swelling, pain with standing, limited range of motion in her shoulders, morning stiffness, and joint problems. (Admin. R. 212).  Dr. Nolan confirmed that Kauffman had rheumatoid arthritis which he described as "reasonably advanced." (Admin. R. 213).  Dr. Nolan cautioned that Kauffman was undertreating her disease and that it would likely progress without aggressive management. (Admin. R. 213).  In reference to Kauffman's functional capabilities, Dr. Nolan surmised that Kauffman would "have problems with repetitive finger activities and have difficulty with fine finger activities." (Admin. R. 213).  He noted that she is unable to raise her arms more than 30 degrees and has limited ability to push or pull.  (Admin. R. 213-214).  He estimated that she could sit for at least six hours and stand/walk for two to four hours in an eight-hour work day. (Admin. R. 214).

State-appointed non-examining medical consultants reviewed Dr. Nolan's report.  One consultant, Dr. Sharon Eder, declined to give controlling weight to his opinion because she felt that it was not consistent with Kauffman's objective ability to work as a grocery clerk.  (Admin. R. 221-22).

---

[1] Dr. Nolan's summary of Kauffman's treatment history lacks important details, such as the specific medications that other doctors prescribed, thus supporting an inference that Dr. Nolan relied on Kauffman's representations and did not review supporting medical records.

On March 4, 2010, Kauffman visited Dorothy Dutton, FNP-C, a nurse working for Dr. Michael O'Gara. (Admin. R. 235-236). Dutton's notes contradict Dr. Nolan's notes regarding the date of, and doctor responsible for, Kauffman's original rheumatoid arthritis diagnosis. Dutton wrote that Dr. Cassell first diagnosed Kauffman with rheumatoid arthritis in 2003. (Admin. R. 236). She noted that Kauffman had been off medication since 2005. (Admin. R. 236). Before then, she had tried methotrexate for several years and sulfate until it caused increased symptoms. (Admin. R. 236). Kauffman complained to Dutton of "increased joint pain, joint swelling, muscle weakness, and tenderness in shoulders, hands, feet, knees, and hips." (Admin. R. 236). At Kauffman's request, Dutton referred Kauffman to Dr. Karen Basin, a rheumatoid arthritis specialist, for further evaluation and treatment. (Admin. R. 236).

On June 9, 2010, Kauffman consulted with Dr. Basin. (Admin. R. 242). Kauffman complained of pain in her shoulders, feet, buttocks, hands, wrists, and neck; swollen joints and nodules; morning stiffness; difficulty elevating her arms above her head; difficulty closing her hands into fists; a slowing gait; fatigue; lack of balance; and a history of her fingers turning white when cold. (Admin. R. 242). Dr. Basin physically examined Kauffman and documented her impression that Kauffman "has functional limitations in shoulders, hands, and feet related to joint damage and deformities" which "prevents her from doing most forms of work." (Admin. R. 243). Dr. Basin ordered x-rays of Kauffman's hands, wrists, and feet. (Admin. R. 244). The radiology report identified some bone loss, narrowing joint spaces in the wrists, some deformities, and a few erosions which Dr. Basin characterized as "consistent with rheumatoid arthritis." (Admin. R. 245, 254). She prescribed Leflunomide to Kauffman and advised her to take Ibuprofen instead of aspirin two to three times a day. (Admin. R. 244).

As directed by Dr. Basin, Kauffman returned for a follow-up visit on August 10, 2010. (Admin. R. 254). Kauffman reported that her pain and swelling had reduced to a manageable level. (Admin. R. 254). Dr. Basin noted that Kauffman's condition had subjectively improved but that her functional limitations remained the same. Kauffman still struggled to elevate her hands above her head, had difficulty closing her hands into fists, and walked slowly. (Admin. R. 254).

Dr. Basin completed an "Arthritis Residual Functional Capacity Questionnaire" in regards to Kauffman, which the Social Security Administration received on September 17, 2010. (Admin. R. 257). In it, Dr. Basin listed Kauffman's prognosis as "poor" and confirmed that Kauffman was not malingering. (Admin. R. 257). Dr. Basin estimated that Kauffman's pain was severe enough to frequently interfere with her attention and concentration. (Admin. R. 257). In response to the question "to what degree can your patient tolerate work stress?," Dr. Basin wrote "probable [sic] unable to work, so stress is not even an issue here." (Admin. R. 259). Dr. Basin declined to answer multiple questions within the questionnaire; including how often Kauffman would require breaks, how much she can lift or carry, how long she can sit/walk/stand, and how much she can reach/handle/finger; saying that she was "unable to estimate." (Admin. R. 258-260).

On October 13, 2010, a week before the ALJ hearing, Kauffman visited Dr. Basin again. (Admin. R. 261). Dr. Basin noted that "[p]atient feels good, in fact better than last time." (Admin. R. 261). Kauffman was still experiencing some pain and swelling, but she said that she could manage it. Kauffman's functional limitations remained unchanged.

On December 15, 2010, months after the ALJ hearing and thus outside of the records before the ALJ at the time of his decision, Kauffman visited Dr. Basin. (Admin. R. 264).

Kauffman reported that she felt about the same. Her pain level had risen a bit but she still felt that it was manageable. She complained that she had limited endurance for some physical tasks, like knitting. Dr. Basin documented her impression of Kauffman's prognosis: "I really don't feel she could work given the extent of her joint damage. At this time, she has been [on Leflunomide] since 6/10 and is subjectively improved, though she still has some synovitis and functional limitations, and these are likely to persist." (Admin. R. 265).

Also after the ALJ hearing, Kauffman visited Nurse Dutton on December 30, 2010. (Admin. R. 263). The appointment focused on Kauffman's cerebral palsy. Kauffman stated that she had not received treatment for her cerebral palsy since she was diagnosed with it at the age of seven. (Admin. R. 263). Kauffman sought a referral to a neurologist due to a decline in her motor skills and increasing unsteadiness on her feet. Dutton referred Kauffman to Dr. Bobek, a neurologist, for further evaluation. (Admin. R. 263).

Later, on March 15, 2011, Kauffman visited Dr. Basin. (Admin. R. 268). Kauffman reported that she felt stiffer but that her pain levels were still manageable. (Admin. R. 268). Dr. Basin recommended that Kauffman try a biologic therapy, Enbrel, for her rheumatoid arthritis. (Admin. R. 269). At a follow-up appointment on August 19, 2011, Kauffman reported that she had not seen a benefit from the Enbrel, but that she might need more time since she had discontinued use for two months due to a shingles infection. (Admin. R. 271).

III.    Vocational Evidence

Vocational expert, Francene Geers ("Geers"), testified at the hearing. (Admin. R. 57). Geers explained that the Dictionary of Occupational Titles ("DOT") classifies Kauffman's prior job, grocery clerk, as "semi-skilled" and "light in nature." (Admin. R. 59). However, Geers said

that she considers the position to be "medium in nature" since clerks are required to lift heavy items and remain on their feet throughout their shifts. (Admin. R. 59).

The ALJ asked Geers to consider whether a hypothetical person of Kauffman's age with the same education and work history would be able to work as a grocery clerk if the person could lift, push, and pull "20 pounds occasionally and 10 pounds frequently" and "stand and walk for six hours and sit for six hours" with standard breaks interspersed. (Admin. R. 59-60). Geers answered that the hypothetical person would not be able work as a clerk. (Admin. R. 60). However, the person could work as a motel cleaner, electronics worker, or folder. (Admin. R. 60-61).

The ALJ posed a second hypothetical to Geers:

> Let's assume that this person's capability is more in the sedentary range; let's assume that this person can lift 10 pounds occasionally and less than 10 pounds on a frequent basis; let's assume that this person can stand and walk for two hours and sit for six hours; let's assume that this person needs a brief change of position no more than five minutes every hour for the purpose of alleviating discomfort; let's assume this person should not be required to be on ropes or ladders or scaffolds; let's assume that this person can frequently balance; let's assume that this person can occasionally stoop, kneel, and crouch, but let's assume that this person should not be expected to crawl as part of his or her work activities; let's assume that this person should have no requirement of reaching overhead, this would be bilateral; and let's assume that this person can frequently reach in all other directions. Let's assume that with respect to handling and fingering, that this person is capable of frequently handling and fingering and that this person has no limitations on feeling.

(Admin. R. 61-62).

The ALJ asked Geers whether the hypothetical person with Kauffman's same background would be able to work as a grocery clerk with these limitations. (Admin. R. 62). Geers opined that the person could not perform the duties of a grocery clerk, but could work as an order clerk, surveillance system monitor, or charge account clerk. (Admin. R. 62-63). The

ALJ asked Geers whether the person could still perform those three jobs if she could only use her upper extremities to push and pull 10 pounds occasionally and less than 10 pounds frequently. (Admin. R. 63). Geers said the person could still perform the jobs. (Admin. R. 63). The ALJ added a further limitation, asking whether the person could still perform the three jobs if she could only finger occasionally. (Admin. R. 63). Geers responded that the person could still perform the jobs despite that limitation. (Admin. R. 64). Next, the ALJ asked whether the person could perform the jobs if she could only handle occasionally. (Admin. R. 64). Geers said that limitation would rule out all three jobs and that no other jobs would be available since sedentary-level jobs require frequent handling and reaching. (Admin. R. 64-65).

Regarding the second hypothetical and its added variations, the ALJ asked Geers what the permissible range of absenteeism would be for the three jobs she identified: order clerk, surveillance system monitor, and charge account clerk. (Admin. R. 65). Geers testified, "[i]ts usually one day a month cumulative and so this month you don't use the day, next month you have two." (Admin. R. 65).

IV.    ALJ Decision

In a decision dated November 4, 2010, the ALJ concluded that Kauffman was not disabled under section 216(i) and 223(d) of the Act. (Admin. R. 21). The ALJ found that Kauffman had not engaged in any substantial gainful activity since November 5, 2008, her alleged onset date. (Admin. R. 14). He found that Kauffman's rheumatoid arthritis and cerebral palsy constituted "severe impairments." (Admin. R. 14). However, he did not believe either impairment, or the combination thereof, met or was medically equal to a listed impairment. (Admin. R. 14). The ALJ concluded that Kauffman had the residual functional capacity ("RFC")

to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), with some additional limitations:

> [S]he needs a brief change of position, not to last more than five minutes, every hour. She can push and/or pull with her upper extremities bilaterally up to 10 pounds occasionally and less than 10 pounds frequently. She can balance frequently, but she can stoop, kneel, crouch, and climb ramps or stairs no more than occasionally. She cannot crawl or climb ladders, ropes, and scaffolds. The claimant cannot reach overhead bilaterally. She can frequently reach in all other directions. She can perform gross manipulations (handling) frequently and fine manipulations (fingering) occasionally.

(Admin. R. 15). Given these limitations, the ALJ held that Kauffman could not perform her past relevant work as a grocery clerk. (Admin. R. 19). However, he found that Kauffman was capable of adjusting "to other work that exists in significant numbers in the national economy" including occupations like order clerk, surveillance system monitor, or charge account clerk.

The ALJ discounted the credibility of Kauffman's testimony regarding the onset date of her disability. He noted that Kauffman alleged disability as of November 2008; however, the first medical records submitted as evidence are dated May 2009. (Admin R. 15). Furthermore, Kauffman was working full-time until her alleged onset date when she was fired for theft. (Admin. R. 15). Kauffman stopped working because she was terminated, not because of her impairments. (Admin. R. 16). Her employer never took adverse personnel actions against her related to her physical limitations. (Admin. R. 15). The ALJ noted that Kauffman's claim that she couldn't have continued working even if Safeway had retained her was "slightly undermine[d]" by the fact that she did not apply for Benefits until four months after her termination. (Admin. R. 16). In addition, Kauffman filed for unemployment benefits after her alleged onset date and, in doing so, certified that she had the capacity to work. (Admin. R. 16).

At the hearing, the ALJ had warned that "in no event" would he find Kauffman disabled on her alleged onset date since she was employed full-time up to that date. (Admin. R. 66). Further, he said it would be "very difficult" to find her disabled on the date of her Benefits application because she reported that she could walk a mile in a report submitted one month later. (Admin. R. 66). Therefore, the ALJ raised the possibility of considering her disability as of some later date. (Admin. R. 66). Kauffman's attorney suggested a revised onset date of February 2010 to reflect when Kauffman moved in with her father. (Admin. R. 66-67). The ALJ agreed that he would consider her petition for Benefits as of that date. (Admin. R. 68). However, the ALJ's decision addressed whether Kauffman was disabled from November 5, 2008 through the date of the decision. (Admin. R. 21).

The ALJ found that Kauffman's statements regarding the intensity, persistence, and disabling effects of her symptoms were "less than fully credible." (Admin. R. 18). He concluded her allegations were unsupported by the objective findings of the record. (Admin R. 18). For instance, Kauffman complained that cerebral palsy slowed her motor skills but testified that she had suffered from the condition all her life and that it had not negatively impacted her prior employment. (Admin. R. 19). In addition, the ALJ noted that no doctor observed Kauffman's alleged hand tremors which she said stemmed from her cerebral palsy. (Admin. R. 18). The ALJ was also influenced by Kauffman's function report, dated April 2009, in which she listed multiple daily tasks that she was capable of performing: personal care, family care, cooking, cleaning, driving, shopping, handling finances, cross-stitching, scrapbooking, and reading. The ALJ concluded that Kauffman's representation that she performed many of the daily functions of an independent adult "belied her description of disabling symptoms at that time." (Admin. R. 16). The ALJ relied on Kauffman's 2009 report as an accurate version of her

abilities and, therefore, found no basis for finding her significantly limited. (Admin. R. 19). He expressed doubt that her capabilities had deteriorated since then, noting that there was "little evidence" that her condition had worsened since Dr. Nolan's examination and that later medical reports indicated that she had "few radiographic erosions." (Admin. R. 18- 19).

The ALJ gave Mr. Hulburt's testimony "little to some weight." (Admin. R. 19). Since Hulburt himself had suffered from rheumatoid arthritis for decades, the ALJ expressed concern that Hulburt might be apt to transfer his own experience onto his observations of his daughter's experience. (Admin. R. 19). For example, Hulburt encouraged Kauffman to apply for Benefits when she was still employed by Safeway, a time when it was "highly unlikely" that Kauffman was disabled. (Admin. R. 19). Hulburt had also testified that Kauffman's condition was progressively worsening, contradicting Kauffman's representations to Dr. Basin that her pain had decreased and her limitations were the same. (Admin. R. 19).

The ALJ noted that Dr. Nolan evaluated Kauffman within a month of her filing a function report in which she reported "significant[ly] more functional ability than she displayed in Dr. Nolan's examination." (Admin. R. 17). Nonetheless, the ALJ gave "strong weight" to Dr. Nolan's opinion, holding that his objective findings clearly supported the specific limitations that he identified. (Admin. R. 17). Relatedly, the ALJ gave "some weight" to the opinions of the state-appointed medical consultants who reviewed Dr. Nolan's assessment, but noted that they did not give Dr. Nolan adequate deference. (Admin. R. 17).

In contrast, the ALJ gave "little weight" to Dr. Basin's "conclusory statement" that Kauffman was "probably unable to work." (Admin. R. 18). He explained that Dr. Basin had a "very short" treatment record with Kauffman, refused to provide a functional assessment of Kauffman, and failed to perform any objective testing to determine whether Kauffman's pain

interfered with her concentration. (Admin. R. 18). Moreover, he noted that the Commissioner, not a doctor, is tasked with determining disability and a claimant's ability to engage in any substantial gainful activity. (Admin. R. 18).

*Standard of Review*

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler*, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 416.920. First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Yuckert*, 482 U.S. at 140; 20 C.F.R. § 416.920(b).

In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; *see* 20 C.F.R. § 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; *see* 20 C.F.R. § 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 416.920(f). If the claimant can, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Secretary. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141-42; *see* 20 C.F.R. § 416.920(g). If the Commissioner meets this burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. § 416.966.

## *Discussion*

Kauffman asserts that the ALJ erred by: (1) improperly discrediting Kauffman's testimony, (2) inappropriately discounting Kauffman's father's testimony, (3) improperly rejecting the opinions of treating and examining physicians, and (4) failing to properly consider all of Kauffman's limitations when assessing whether she could engage in any substantial gainful activity. Kauffman asks this court to credit the testimony discounted or rejected by the ALJ, find Kauffman disabled, and remand this matter for an award of Benefits. As a lesser alternative, Kauffman asks this court to reverse the agency's decision and remand for further proceedings.

The Commissioner contends that the ALJ applied correct legal standards and supported his decision with substantial evidence. Accordingly, the Commissioner asks this court to affirm the ALJ's decision.

I.    Kauffman's Testimony

While the ALJ acknowledged that Kauffman's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, he found that Kauffman's statements regarding the severity and limiting effects of her symptoms were "less than fully credible." (Admin. R. 18). Kauffman takes issue with this adverse credibility finding.

Where, as here, there is no medical evidence of malingering, an ALJ must present clear and convincing reasons for rejecting the claimant's subjective testimony. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). In assessing credibility, the ALJ may consider objective medical evidence and the claimant's treatment history, including any failure to seek treatment, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Additionally, the ALJ may employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements made by the claimant regarding symptoms. *Id.* As detailed below, the ALJ met this standard. The ALJ set forth specific, valid reasons for his adverse credibility finding. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (stating that an ALJ's credibility finding must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."). Accordingly, the ALJ reasonably found that Kauffman was a less than fully credible source.

First, the ALJ found that Kauffman's designation of the date she was fired as her alleged onset date undermined her overall credibility. Kauffman stopped working because her employer

caught her committing a crime against it, not because of any limiting physical condition.  Up until Kauffman's alleged onset date, she was working full time.  Kauffman characterizes rheumatoid arthritis as "a progressive condition . . . not a condition that appears overnight." (Pl.'s Opening Br., at 12).  The ALJ rightly questioned how such a progressive condition could render Kauffman unable to work as of November 5, 2008 when she could engage in substantial gainful activity just one day before.  Kauffman maintains that, even before she was terminated, her condition had worsened such that she was incapable of sustained employment.  For instance, toward the end of her employment, she was absent about two days per month which exceeds the acceptable amount set by the vocational expert.  However, this argument is undermined by Kauffman's demonstrated ability to work at the time as well as the fact that her employer never took any adverse action against her related to her inability to work or absenteeism.  It does not appear that Kauffman's alleged disability was actually disabling.

Second, the ALJ questioned Kauffman's sincerity since her alleged onset date precedes the first day of her submitted medical records.  An "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" can cast doubt on a claimant's credibility.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Kauffman's first medical record on file is dated May 2, 2009 — six months after Kauffman's alleged onset date.  Such conservative treatment reasonably weighs against the credibility of her disability assertion. *Jourdan v. Comm'r, Soc. Sec. Admin.*, 426 Fed. Appx. 499, 500 (9th Cir. 2011) (upholding an ALJ's adverse credibility determination supported, in part, by the claimant's minimal course of treatment for his symptoms).

Third, the ALJ noted that Kauffman's allegations were not supported by objective findings on the record:  no medical provider observed her alleged hand tremors, little evidence

supported her allegation that her condition was worsening, and Kauffman herself testified that her lifelong cerebral palsy had not interfered with her prior employment. While an ALJ cannot make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence," the lack of objective evidence can be one contributing justification. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). Since the ALJ considered multiple other factors in his credibility decision, his discussion of lacking objective evidence was reasonable.

Fourth, the ALJ pointed to the apparent disagreement between Kauffman's representation of her daily activities in her function report and the abilities she displayed when examined by Dr. Nolan. An ALJ should not penalize a claimant for attempting to lead a normal life. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Kauffman need not "vegetate in a dark room excluded from all human and social activity" in order to qualify for Benefits. *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (quoting *Smith v. Califano*, 637 F.2d 968, 971 (9th Cir. 1981)). However, inconsistency with a claimant's daily activities is a specific and legitimate reason for rejecting subjective representations. *Berry v. Astrue*, 622 F.3d 1228, 1235 (9th Cir. 2010) (finding disagreement between claimant's reported symptoms and his ability to walk a mile, drive his car, do crossword puzzles, care for his pet, cook, and clean justified ALJ's decision to discount his subjective complaints); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (upholding adverse credibility determination based, in part, on claimant's demonstrated ability to travel to another country for an extended period of time to care for an ailing relative). Here, it was reasonable for the ALJ to weigh the contradictions between Kauffman's function report and her subjective complaints against Kauffman's overall credibility.

Finally, the ALJ found Kauffman's application for unemployment benefits, in which she certified she was capable of work, to be inconsistent with her Benefits application. The Ninth Circuit has recognized that receipt of unemployment benefits can undermine a claimant's stated inability to work full-time. *See Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988). Here, Kauffman testified that she merely represented she was capable of part-time work, which is not inconsistent with her allegation of disability. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62 (9th Cir. 2008) ("[T]he record here does not establish whether Carmickle held himself out as available for full-time or part-time work. Only the former is inconsistent with his disability allegations."). Accordingly, the ALJ erred to the extent he based his credibility determination on Kauffman's unemployment benefits. However, given the substantial remaining evidence that supports the ALJ's credibility determination, the ALJ's reliance on this basis is a harmless error that does not affect the validity of the ALJ's overall decision. *Id.* at 1162 (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195-197 (9th Cir. 2004)).

II.    Hulburt's Testimony

Lay testimony from a claimant's family and friends is competent evidence of the claimant's symptoms, pain, and daily activities. *Dodrill v. Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993). An ALJ has a duty to consider competent lay witness testimony and must provide "reasons that are germane to each witness" in order to properly discount it. *Id.* at 919.

Here, Kauffman asserts that the ALJ erred in evaluating her father's testimony to be of "little to some weight." Specifically, she challenges the ALJ's basis for opining that Hulburt had transposed his experience with rheumatoid arthritis onto his perception of his daughter's condition. The ALJ justified his concern by citing to two specific instances on the record. First, the ALJ explained that Hulburt encouraged Kauffman to apply for Benefits when she was still

employed, indicating that he perceived her as disabled when it was "highly unlikely" that she was significantly limited.   Second, the ALJ noted that Hulburt testified that Kauffman's condition was worsening while Dr. Basin's medical records showed that Kauffman's pain had decreased and her functional limitations had remained the same.   These are germane reasons for discounting Hulburt's testimony that are substantiated by the record.   Accordingly, the ALJ did not err in in evaluating Hulburt's testimony.

III.   Medical Evidence

The weight attributable to the opinion of a medical source depends, in part, on the professional relationship between the physician and the claimant.   Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than that of a physician who did not examine the claimant but formed an opinion based on a review of the claimant's medical records. *Holohan v. Massanari*, 246 F.3d 1195, 1201-1202 (9th Cir. 2001).

The ALJ can reject a treating or examining physician's opinion that is inconsistent with the opinions of other treating or examining physicians, if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).   An uncontradicted opinion may be rejected only for clear and convincing reasons.   *Id.*   The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician.   *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995).   It may constitute substantial evidence if it is consistent with other evidence in the record.   *Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir. 1989).

An ALJ need not accept a physician's opinion that is brief, conclusory or inadequately supported by clinical findings. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Additionally, if a claimant is found not credible, an ALJ may appropriately disregard statements the claimant made to his physicians. *Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (9th Cir. 2001).

### A. Dr. Basin's Observations & Opinion

Kauffman argues that the ALJ improperly rejected Dr. Basin's opinion that Kauffman was probably not able to work. As a treating physician, Dr. Basin's opinion is due greater weight than the opinions of non-treating physicians, such as Dr. Nolan, because she "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). In addition, as a specialist in rheumatoid arthritis, Dr. Basin's opinions within her specialty should be accorded more weight than those of non-specialists. *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). However, this is not to say that Dr. Basin's opinion is conclusive on the issue of Kauffman's disability. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability"). The ALJ need not accept the opinion of any physician, including a treating specialist, if that opinion is brief, conclusory, and inadequately supported by clinical findings. *Bayliss*, 427 F.3d at 1216. For example, in *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996), the Ninth Circuit held that an ALJ properly rejected a psychological evaluation comprised of checked boxes and no supporting explanations.

Here, the ALJ set forth multiple valid reasons for affording little weight to Dr. Basin's "conclusory statement" that Kauffman was "probably unable to work." (Admin. R. 18). First, he noted that, in the same report in which Dr. Basin concluded that Kauffman was not fit for work, Dr. Basin said she was "unable to estimate" Kauffman's ability to sit, stand, walk, lift, carry, twist, stoop, crouch, climb, reach, finger, handle, or grasp; how long and how often Kauffman would need to take unscheduled breaks in a workday; and what Kauffman would need to do on such unscheduled breaks. (Admin. R. 257-260). The ALJ was suspicious of Dr. Basin's basis for concluding that Kauffman couldn't work given her conceded inability to determine Kauffman's functional capabilities and limitations.

Second, the ALJ noted that Kauffman had a "very short treatment record" with Dr. Basin. (Admin. R. 18). Kauffman's relationship with Dr. Basin began in June 2010 and, at the time of the hearing, they had met on only three occasions. The Commission gives more weight to the opinions of providers who have seen a claimant long enough to acquire "a longitudinal picture" of the claimant's impairment. 20 C.F.R. § 404.1527(c)(2)(i). Kauffman argues that consideration of this factor is inappropriate because Dr. Basin had the longest treating relationship with Kauffman on the record; however, the ALJ reasonably concluded that Dr. Basin is not due deference because of Kauffman's sparse treatment history.

Third, the ALJ noted that Dr. Basin did not perform any objective testing to confirm that Kauffman's subjective pain interfered with her attention and concentration. An ALJ cannot reject a doctor's conclusion merely because he feels that it is not supported by objective laboratory findings. *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991) ("[O]nce the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully

corroborate the alleged severity of pain"). However, Dr. Basin's opinion was based on Kauffman's representations and, since the ALJ validly discounted Kauffman's credibility, Dr. Basin's opinions based on Kauffman's subjective expressions are also due less weight. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (ALJ's adverse credibility finding regarding claimant was a "specific, legitimate reason for rejecting the opinion of a treating physician" who premised her opinion on the claimant's complaints).

Finally, the ALJ stated that the determination of disability or ability to engage in past relevant or other work are issues reserved to the Commissioner. Dr. Basin is qualified to express opinions on medical issues, not vocational matters like Kauffman's ability to work. Ultimately, the ALJ, not Dr. Basin, is charged with the task of determining whether Kauffman had the ability to work any job. *McLeod v. Astrue*, 640 F.3d 881, 884-85 (9th Cir. 2010) (holding that ALJ correctly rejected doctor's opinion on whether claimant could work because it intruded on the Social Security Administration's jurisdiction). Accordingly, the ALJ acted reasonably in refraining from deferring to Dr. Basin's judgment on matters outside of her expertise.

### B.   Dr. Nolan's Assessment

Kauffman contends that, while the ALJ gave strong weight to Dr. Nolan's assessment, he failed to carry forward his observations that Kauffman "would be expected to have problems with repetitive finger activities and have difficulty with fine finger activities." (Admin. R. 213). The ALJ accounted for Kauffman's hand limitations in his RFC, saying she can "perform gross manipulations (handling) frequently and fine manipulations (fingering) occasionally." (Admin. R. 15). However, Kauffman maintains that this did not impose sufficient limitations.

There is no relationship between the ALJ's statement that Kauffman could perform "handling" activities frequently and Dr. Nolan's observations that Kauffman would struggle with

"finger activities" and "fine finger activities." The two statements address separate and distinct physical functions. "Handling" involves actions like seizing, holding, grasping, or turning an object. SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES, APPENDIX C (1993). While "handling" necessarily involves the fingers, to the extent that they are an extension of the hand, it is distinct from "fingering" which involves more finger-centric activities like picking and pinching. *Id.* Dr. Nolan did not discuss Kauffman's ability to perform gross manipulations with her hands; instead, he focused exclusively on her "fingering" abilities. Accordingly, there is nothing to suggest that the ALJ failed to properly incorporate Dr. Nolan's observations into the "handling" portion of Kauffman's RFC.

Regarding the "fingering" portion of the RFC, Kauffman maintains that the ALJ did not properly integrate Dr. Nolan's observation that Kauffman would struggle with "repetitive finger activities" or "have difficulty with fine finger activities." Dr. Nolan's assessment was not written in Benefits terminology. Accordingly, the ALJ had to convert Dr. Nolan's word choice into Social Security terms when formulating Kauffman's RFC. The meaning of "repetitive" within the Benefits context is open to more than one rational interpretation.

The Ninth Circuit has treated "repetitive" as a measure of frequency. The Dictionary of Occupational Terminology ("DOT") sets forth four measures of frequency: "not present," "occasionally," "frequently," and "constantly." *Id.* It defines "occasionally" as up to one-third of the time, "frequently" as one-third to two-thirds of the time, and "constantly" as two-thirds or more of the time. *Id.* The DOT does not recognize or define "repetitive." However, in *Armbruster v. Barhart*, 209 Fed. Appx. 713, 715 (9th Cir. 2006), a vocational expert testified that a claimant could not work as a data entry clerk because the job involved repetitive keyboard use,

but could work as a motor vehicle field officer because keyboard use was "not as frequent." In doing so, the VE treated "repetitive" as a descriptor of the rate of occurrence, much like "occasional" or "frequent." The Ninth Circuit did not take issue with this interpretation. In a similar sister circuit case, the Tenth Circuit upheld an ALJ's RFC which relied on a vocational expert's testimony equating "repetitive" to "constant," finding that the claimant could still perform "frequent" actions despite being restricted from "repetitive" actions. *Gallegos v. Barnhart*, 99 Fed. Appx. 222, 224-225 (10th Cir. 2004).

The Ninth Circuit has also held that the term "repetitive" may be used to indicate a qualitative characteristic — in what manner one can use her fingers – not a quantitative measure, like "frequently" and "occasionally." *Gardner v. Astrue*, 257 Fed. Appx. 28, 30 n.5 (9th Cir. 2007). For instance, in *Gardner*, an ALJ's RFC precluded a claimant from handling items in a repetitive manner. *Id.* In response to the ALJ's hypothetical, a vocational expert testified that the claimant could perform certain jobs if he could use his hands frequently in a repetitive manner, but not if he was required to use his hands constantly in a repetitive manner. *Id.* The Ninth Circuit remanded for clarification, noting that the vocational expert's testimony was not in line with the RFC which precluded the claimant from repetitive handling, regardless of whether that handling was constant or frequent. *Id.*

"Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The Ninth Circuit has recognized two reasonable interpretations of "repetitive:" as a measure of how often a claimant can perform an action as well as an indicator of the manner in which a claimant can perform an action. In due deference, the ALJ's adoption of the former should be upheld.

In addition, Kauffman alleges that the ALJ's discussion of Dr. Nolan's examination reveals that he applied an incorrect standard to determine disability. Kauffman asserts that the hearing record shows that the ALJ inappropriately focused on Kauffman's statement in her function report that she could walk a mile. At the hearing, the ALJ said "it's very difficult for me to conclude that somebody that can walk a mile is disabled." (Admin. R. 54). However, the ALJ spoke in more general terms in his decision. He noted that Kauffman's function report, which she completed within a month of her appointment with Dr. Nolan, described more functional ability than that which she displayed in Dr. Nolan's examination. Despite this apparent discord, the ALJ gave Dr. Nolan's observations "strong weight" because "he provided specific functional limitations that reasonably could be supported by his objective findings." (Admin. R. 17). The ALJ's written decision does not indicate that Kauffman's walking ability was a contributing factor to the ALJ's ultimate assessment of disability. Therefore, any error that the ALJ may have committed at the hearing by focusing on Kauffman's stated ability to walk a mile was harmless and should not negate the validity of the ALJ's final determination. *Batson v. Commissioner*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding any error the ALJ may have committed by assuming the claimant sat while watching six to ten hours of television a day was harmless given the substantial evidence supporting the ultimate disability decision).

IV.   Fifth Step Determination

Kauffman set forth three alternative arguments for reversal of the ALJ's step five finding. First, she contends the ALJ erred by posing a hypothetical to the vocational expert that did not set forth all of Kauffman's alleged limitations. The Ninth Circuit stated in *Spindel v. Comm'r Soc. Sec. Admin.*, 333 Fed. Appx. 174, 176 (9th Cir. 2009), that an ALJ rightly relies on a vocational expert's testimony that responds to a hypothetical containing "all of the limitations

that the ALJ found credible." Furthermore, an ALJ need only include those limitations he finds supported by the record as a whole. *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002). As discussed in the sections above, the ALJ properly weighed the evidence and made reasonable credibility determinations. Accordingly, the ALJ was not obligated to include validly discredited allegations in his hypothetical.

Second, Kauffman argues that the three positions identified by the vocational expert as alternative available work are not accurate or available. Kauffman states, and the Commissioner concedes, that the job of order clerk requires frequent fingering which exceeds Kauffman's abilities as stated in the ALJ's RFC. Accordingly, the ALJ erred by finding Kauffman capable of working as an order clerk. However, this error is harmless given the two other jobs identified that Kauffman is qualified to fill.

Nonetheless, Kauffman maintains that she cannot work in either position. Kauffman claims she is unable to work as a charge account clerk because she is unable to speak with customers over the phone. When Kauffman filed for Benefits, a Social Security employee noted that she was difficult to understand. However, beyond this single comment from a non-medical professional, there is no evidence on the record to suggest that Kauffman cannot communicate effectively. Furthermore, Kauffman testified at the hearing that her cerebral palsy affected her voice but that the condition had not impacted her ability to work as a grocery clerk, a position which necessarily involved customer interaction. As such, substantial evidence on the record supports the ALJ's decision that Kauffman could fulfill the duties of a charge account clerk.

Next, Kauffman cites to *Beltran v. Astrue*, 700 F.3d 386 (9th Cir. 2012), for the proposition that the occupation of surveillance system monitor does not exist in significant numbers in the regional economy. In *Beltran*, the Ninth Circuit held that neither the 135

surveillance system monitor jobs identified in California, nor the 1,680 national jobs identified, constituted a significant number of job prospects. *Id.* at 390. However, here, the vocational expert testified that there are approximately 47,000 surveillance system monitor positions in the national economy and 210 in Oregon. (Admin. R. 62). If either of these two numbers is "significant," we must uphold the ALJ's decision. 42 U.S.C. § 423(d)(2)(A) ("work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country"). The 47,000 jobs at issue here far exceed the 1,680 national jobs deemed to be insignificant in *Beltran*. When paired with the 97,000 national and 365 Oregon charge account clerk positions identified, the ALJ reasonably concluded that Kauffman has a substantial pool of prospective employment. (Admin. R. 63).

Finally, Kauffman argues that the ALJ should have found her disabled under Social Security Ruling 96-9p. According to S.S.R. 96-9p, "a finding of 'disabled' usually applies when the full range of sedentary work is significantly eroded." S.S.R. 96-9p, 1996 WL 374185, at *3 (July 2, 1996). In relevant part, it furthers "[a]ny significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." *Id.* at *8. Kauffman argues that the ALJ's finding that "she can perform gross manipulations (handling) frequently and fine manipulations (fingering) occasionally" constitutes a "significant manipulative limitation" under S.S.R. 96-9P such that a finding of disabled would normally apply. (Admin. R. 15).

S.S.R. 96-9p explains that someone who is restricted from performing any job that requires bilateral manual dexterity would be considered to have a significant manipulative limitation. *Id.* It advises "[w]hen the limitation is less significant . . . it may be useful to consult a vocational resource." *Id.* Unlike the ruling's example, Kauffman is not restricted from

performing any manipulations; she is simply limited in their frequency.  Accordingly, the ALJ rightly consulted with a vocational expert to determine whether Kauffman's work prospects were significantly eroded.  The vocational expert testified that, given her manipulative restrictions, Kauffman was still capable of performing multiple jobs that exist in significant numbers in the national economy.  It was not clearly erroneous for the ALJ to rely on the vocational expert's assessment.

### Conclusion

The Commissioner's findings on Kauffman's disabilities, considering the record as a whole, are supported by substantial evidence.  The decision of the Commissioner should be AFFIRMED.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **November 18, 2013**.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 4th day of November 2013.

JOHN V. ACOSTA
United States Magistrate Judge